Carl K. SHIOJI, Plaintiff and
Respondent,

v.

Terry L. SHIOJI, Defendant
and Appellant.

No. 19611.

Supreme Court of Utah.

Nov. 27, 1985.

Rehearing Denied Jan. 10, 1986.

Bettie J. Marsh, Ogden, for defendant and appellant.

Larrie A. Carmichael, Roy, for plaintiff and respondent.

HALL, Chief Justice:

Defendant Terry L. Shioji (Lone) appeals an order of the district court modifying a divorce decree to award custody of the parties' two minor daughters to their father, plaintiff Carl K. Shioji. We affirm.

The parties were divorced in August 1981. Custody of their two daughters, aged 8 and 4, was granted to defendant. Soon after the divorce, defendant entered a relationship with a man, who began staying overnight in her home every weekend and on other days while the children were present. Plaintiff objected to defendant's practice of having her boyfriend sleep overnight while the children were home because he believed it set bad moral standards for the children. When defendant nevertheless continued the practice, plaintiff petitioned the court for a transfer of custody to him.

At the hearing on plaintiff's petition in January 1982, defendant testified that she saw nothing wrong with having her boyfriend stay overnight while the children were home and that her having done so had had no adverse effect on them. She also testified, however, that her own mother

disapproved of her relationship with her boyfriend and that her eight-year-old daughter had expressed discomfort about being asked and responding to questions from the grandmother about defendant and her boyfriend. Defendant testified she thought the daughter's discomfort was the result of a desire to protect defendant and to not "put her on the spot." Defendant further testified that she thought her daughters were "to some extent" learning from her conduct that there was nothing wrong with her relationship, that she saw "no problem" with that teaching, and that she hoped her daughters would grow up to have a relationship like hers themselves.

The boyfriend similarly testified that he saw "no problems whatsoever" with a single mother having a boyfriend stay overnight while her children were home and that his staying overnight with defendant had had no adverse effect on the children. He conceded, however, that he had never discussed with the children the subject of his overnight visits.

The father testified that he had discussed the conduct of defendant and her boyfriend with his daughters and that he believed the mother's conduct and attitude were leaving the girls with the impression that "their morals can be just as loose as hers." Furthermore, the maternal grandmother of the girls testified that she had spoken to the girls about "men being [in their home]" and that they felt "a type of resentment" about it.

After the hearing, the court spoke with the children in chambers in a recorded but untranscribed session. Afterward, the trial court reported that the children had told the court that the boyfriend slept on the couch when he stayed overnight but, when asked if that was true, recanted and said that defendant had told them to say that.

Without making written findings of fact, the trial court entered an order transferring custody of the children to plaintiff. Soon thereafter, defendant petitioned the court to restore custody to her, alleging

that she had married and would no longer work in order to provide full-time care for the children. Defendant denied having told the children to tell the court the boyfriend slept on the couch and offered to take a lie detector test to support her denial. The trial court refused to again modify the decree, and defendant appealed, both from the order modifying the decree and the order denying her subsequent petition to modify.

On appeal, we vacated the order transferring custody because of the lack of written findings of fact and remanded the case to the trial court for the entry of such findings.[1] On remand, based on the testimony given at the previous hearing, the court entered lengthy and detailed findings of fact and conclusions of law and again ordered the change in custody.

Notably, the court found that defendant's practice of having the boyfriend stay overnight in the home "was a regular and frequent occurrence," that the children were having "serious difficulty in adjusting to defendant's inappropriate behavior," and that defendant's conduct with her boyfriend had "a substantial adverse effect on the moral development of the children." The court further found that defendant and her boyfriend "appeared indifferent to the potential adverse effect this arrangement might have on the children." The court therefore held that defendant's relationship with her boyfriend constituted a substantial change in the circumstances on which the original custody award was based, justifying a reopening of the custody issue.

Based on evidence regarding plaintiff's relationship with the children, his work schedule, and living and child-care arrangements, the court found that plaintiff was a "good and caring parent, fully capable ... to properly raise the children as custodial parent." Finally, the court determined that, while it made "no finding that defendant was unfit as a mother," the "children's total needs, including physical, emotional and moral needs, would be better served by

---

1. *See Shioji v. Shioji,* Utah, 671 P.2d 135 (1983).

awarding custody to plaintiff rather than to defendant...."

■ Under U.C.A., 1953, § 30–3–5(1), the trial court has continuing jurisdiction to make "reasonable and necessary" changes in the custody provisions of a divorce decree. In *Hogge v. Hogge*,[2] this Court established a two-step analysis for determining whether to modify a divorce decree to transfer custody from one parent to the other.[3] First, the trial court must decide whether there has been a change in the circumstances on which the former custody award was based that is sufficiently substantial and material to justify reopening the custody question.[4] Second, if such a change in circumstances is found, the court must determine de novo which custody arrangement will serve the best interests of the child.[5]

On appeal, defendant argues that the trial court erred in applying both steps of the *Hogge* analysis. We first address defendant's challenge to the trial court's conclusion that there had been a substantial and material change in circumstances justifying a reopening of the custody issue.

In *Becker v. Becker*,[6] we stated that to meet the threshold showing of a change in circumstances,

> a party [seeking a transfer of custody] must show, in addition to the existence and extent of the change, that the change is significant *in relation to* the modification sought. The asserted change must, therefore, have some material relationship to and substantial effect on parenting ability or the functioning of the presently existing custodial relationship.[7]

■ In this case, the trial court found that since the time of the divorce defendant had not only entered an extramarital sexual relationship, but her conduct and attitude with respect to the relationship had a material and adverse effect on her parenting ability. The court found that the boyfriend's overnight stays were a "regular and frequent occurrence" having a "direct effect on the children." It found that this living arrangement caused the children embarrassment and discomfort in their own relationships with close family members, who viewed defendant's conduct as immoral and repugnant. It found that defendant's conduct had made the children feel compelled to lie to the court and was thus detrimental to their moral development. Finally, the court found that defendant and her boyfriend were either unwilling or unable to appreciate the adverse impact of their conduct on the children. These findings, taken as a whole, support the conclusion that there had been, since the date of the divorce, a substantial and material adverse change in defendant's parenting ability stemming from her relationship with her boyfriend.

Defendant contends that the court's decision was based solely on the fact that defendant's boyfriend stayed overnight in her home on occasion and, if upheld, would allow "continuous relitigation of custody by vengeful former spouses whenever the custodial parent becomes involved in similar post-divorce courtships." This Court has previously held, however, that a custodial parent's extramarital sexual relationship alone is insufficient to justify a change in custody.[8] The trial court's findings in

2. Utah, 649 P.2d 51 (1982).

3. *Id.* at 54.

4. *Id.*

5. *Id.*

6. Utah, 694 P.2d 608 (1984).

7. *Id.* at 610 (emphasis in original).

8. *See Stuber v. Stuber*, 121 Utah 632, 637, 244 P.2d 650, 652 (1952) ("The fact that [the mother] lived with a man whom she expected to marry, although censurable, does not in itself make her an unfit and improper person to have custody of her child."). *See also Sparks v. Sparks*, 29 Utah 2d 263, 508 P.2d 531 (1973) (upholding denial of petition to transfer custody to father on ground that mother lived with a man to whom she was not married); *Dearden v. Dearden*, 15 Utah 2d 105, 388 P.2d 230 (1964) (modifying award of custody to father granted by trial court on ground that mother committed adultery).

this case go far beyond a single finding that defendant engaged in extramarital intercourse or that she, on occasion, allowed her boyfriend to stay overnight. The key to our decision is the court's finding of a substantial adverse impact on the children as a result of defendant's behavior.

Moreover, the court's findings are adequately supported by the evidence. In divorce proceedings, including custody matters, the trial court is accorded particularly broad discretion.[9] Only where the trial court's judgment is so flagrantly unjust as to be an abuse of discretion, will this Court interpose its own judgment.[10] The issue on appeal is not whether the trial court's findings accord with our own view of the evidence, but whether, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the findings, the findings are supported by the evidence. The trial court's proximity to the witnesses and its opportunity to hear their testimony and observe their demeanor, places it in a far more advantaged position than this Court, which must rely on an inanimate record. This factor is particularly important in the instant case because the trial court relied heavily upon an in-camera interview of the children, conducted by stipulation of the parties and not transcribed or made available for our review.

The court's account of its interview with the children supports its determination that the unsanctioned nature of defendant's relationship with the boyfriend caused the children considerable discomfort, even making them feel compelled, in a private interview with the court, to lie about whether the boyfriend slept on the couch. Furthermore, defendant's testimony may fairly be interpreted to show a blindness or refusal to recognize even the possibility of an adverse impact on the children as a result of her conduct, at odds with the moral views of the children's father and grandmother with whom the children closely associated. The testimony of the father and grandmother, again viewed in the light most favorable to the court's findings, also supports the conclusion that the girls were adversely affected by defendant's conduct.

Admittedly, there is substantial evidence on the record from which the trial court could have concluded the boyfriend's overnight stays had no substantial adverse impact on the girls or on defendant's parenting ability. Both defendant and her boyfriend testified that theirs was a "serious" relationship, although of a duration of only two and a half months at the time of the hearing on which the trial court based its findings. The trial court itself stated that the girls seemed happy under defendant's care. Nevertheless, on appeal from a judgment of the trial court, our role is not to substitute our own findings for those of the trial court, but to examine the record for evidence supporting the judgment. In this case, such an examination leads to the conclusion that the finding of a substantial change in circumstances is adequately supported by the record.

As to defendant's contention that the court, applying the second part of the *Hogge* analysis, erred in finding the best interests of the children required transferring custody to the father, we again hold that the finding was within the trial court's discretion and based on substantial competent evidence. The trial court received extensive evidence regarding defendant's past care of the children and plaintiff's arrangements for assuming responsibility for their future care. The court determined that the children's "total needs, including physical, emotional and moral needs, would be better served by awarding custody to plaintiff rather than to defendant." As we stated in *Hogge*, the determination of what is reasonable and necessary for the best interests of the child "may frequently and of necessity require a

---

**9.** *Jorgensen v. Jorgensen*, Utah, 599 P.2d 510, 511–12 (1979); *Cox v. Cox*, Utah, 532 P.2d 994, 995 (1975).

**10.** *Jorgensen*, 599 P.2d at 512.

choice between good and better." [11] There is no evidence in the record in this case mandating a conclusion contrary to that of the trial court.

▰ Finally, defendant argues the trial court erred in denying her petition to modify the custody award to plaintiff. While defendant's marriage and arrangements to care for the children on a full-time basis could have supported a finding of a substantial and material change in the circumstances on which the previous order was based, they do not mandate such a finding. Further, the evidence does not conclusively show that the best interests of the children at the time of the hearing on defendant's petition required transferring custody to defendant.

Affirmed.

STEWART and HOWE, JJ., concur.

ZIMMERMAN, Justice (Dissenting):

I dissent. Today, nearly one-quarter of the nation's families are headed by single parents. *Statistical Abstract of the United States 1985*, at 46. Given the current divorce rate, that figure is expected to increase—perhaps even double—in the near future. These figures mean that an ever-increasing number of children will become the primary casualties on the domestic battlefield. Courts are entrusted with exceptional powers over the children of divorced parents, and our child custody decisions have the effect of setting social policy for a large segment of the population. Therefore, it is incumbent on us to minimize the harm to children caused both by divorce and by ensuing custody disputes. In affirming a change-of-custody order that is utterly lacking in factual support, the majority has adopted an ill-considered approach to change-of-custody proceedings which will encourage courts to tinker with child custody arrangements with minimal justification, something that can only cause more grief for divorced parents and do more harm to their children.

This Court has recently stressed the need for stability in child custody arrangements by requiring that trial courts comply with stringent standards when modifying custody awards. In *Hogge v. Hogge*, Utah, 649 P.2d 51 (1982), we stated that a two-part test must be met before a custody order is reopened. The trial court first must determine that a substantial and material change in circumstances has occurred since entry of the last custody order. Only after such a change in circumstances is established may the trial court "determine *de novo* which custodial arrangement will serve the welfare or best interests of the child...." 649 P.2d at 54. *Hogge* made it clear that even after a change of circumstances has been found, the need for stability in placements raises a presumption against changing custody.[1]

In *Becker v. Becker*, Utah, 694 P.2d 608 (1984), we made it clear that the burden on one seeking to reopen a custody order is heavy. It is not enough to show a change of circumstances; the change must be one that has *"some material relationship to and substantial effect on parenting ability or the functioning of the presently existing custodial relationship."* 694 P.2d at 610 (emphasis added). We explained that requiring a high threshold showing before an order can be opened is necessary because "custody placements, once made, should be as stable as possible unless the factual basis for them has completely changed." *Id.* Requiring an adverse material change in circumstances "protect[s] the custodial parent from harassment by repeated litigation and protect[s] the child from 'ping-pong' custody

---

**11.** 649 P.2d at 55.

**1.** The Court there stated:
> [H]aving found that a substantial and material change in circumstances justifies a reconsideration of the custody award, the trial court must consider the changes in circumstance along with all other evidence relevant to the welfare or best interests of the child, *including the advantage of stability in custody arrangements that will always weigh against changes in the party awarded custody.*
> 649 P.2d at 54 (emphasis added).

awards." *Hogge v. Hogge,* 649 P.2d at 53–54.

The law in Utah and elsewhere addresses the circumstances under which extramarital sexual intercourse by a custodial parent will be a sufficient ground for a change of custody. In *Stuber v. Stuber,* 121 Utah 632, 244 P.2d 650 (1952), decided before adoption of the *Hogge* two-step analysis, we held that such conduct did not warrant a custody change unless an adverse impact on the children has been shown. The law is similar in other states. *See Kruer v. Kruer,* 334 Mich. 641, 645, 55 N.W.2d 134, 136 (1952); *Wackerman v. Wackerman,* 16 Ariz.App. 382, 387, 493 P.2d 928, 933 (1972); *Commonwealth ex rel. Steiner v. Steiner,* 257 Pa.Super. 457, 461, 390 A.2d 1326, 1328 (1978). Courts using a two-step analysis similar to *Hogge*'s have held that extramarital sexual intercourse by a custodial parent, without more, is not a sufficiently material change of circumstances to warrant reconsideration of custody. Consistent with our *Stuber* and *Becker* decisions, these courts have also found that there must be some showing that such activity has rendered the custodial parent less able to care for the children than he or she was at the time of the initial custody award. *See, e.g., In re Marriage of Niedert,* 28 Or.App. 309, 559 P.2d 515, 519 (1977); *Dent v. Dent,* 273 S.C. 387, 390, 256 S.E.2d 743, 745 (1979); *Patterson v. Patterson,* Ala.Civ.App., 399 So.2d 846, 848 (1980); *Helgenberger v. Helgenberger,* 209 Neb. 184, 188, 306 N.W.2d 867, 870 (1981).

The majority properly acknowledges *Stuber* and implicitly recognizes that if it is applied in conjunction with the *Hogge* change-of-circumstances test, that test cannot be satisfied by a showing that the custodial parent has had extramarital sex unless there also is a showing that this conduct resulted in harm that was material to and had a substantial effect on "parenting ability or the functioning of the presently existing custodial relationship." *Becker v. Becker,* 694 P.2d at 610. The majority, however, effectively avoids the result that *Stuber* would mandate here—reversal of the trial court—by relying on the rubric that deference must be given to the trial judge's finding that the mother's extramarital sexual relationship caused harm to the moral development of the children and warranted a finding of a change of circumstances. The supposed "finding" to which the majority defers is really not a finding of fact at all, but a conclusion. As such, it deserves deference only to the extent that it is supported by factual findings properly grounded in record evidence.

A thorough examination of the record reveals that the trial court's factual findings, entered only after we remanded the matter in *Shioji v. Shioji,* Utah, 671 P.2d 135 (1983), are based solely on the record of the original proceeding held two years earlier and are either wholly irrelevant or entirely without record support. Indeed, the findings reflect no more than an after-the-fact attempt to rationalize the initial decision. Nothing in the record satisfies the standard set forth in *Becker.*

For example, the trial court based its decision upon the finding that appellant had not simply engaged in an "occasional" act of extramarital intercourse, but had regularly allowed her boyfriend to stay overnight. The frequency of appellant's sexual contacts with her boyfriend is immaterial in view of the uncontradicted evidence that at all times appellant's activities were discreet and private, the relationship was stable and serious, and appellant's boyfriend had developed a positive and healthy relationship with the children.

The trial court further attempted to justify its decision by finding that appellant's ex-husband and mother objected to her behavior. That finding is equally irrelevant. For obvious reasons, appellant's jealous ex-husband objected to her behavior. And the testimony of appellant's mother, who admittedly dislikes her daughter and blamed the parties' separation upon her daughter's work schedule, was clearly not pertinent.

The trial court's finding that respondent "observed" adverse effects on the children from appellant's behavior has no record support. Although the ex-husband did ob-

ject to appellant's behavior, he did not testify that appellant's conduct adversely affected the children or that the children were uncomfortable with appellant's conduct, nor did he produce any evidence to suggest that the children's moral development was, in fact, deficient. Indeed, the evidence suggests that respondent was not in the least concerned with the impact of appellant's conduct upon the children's values, but was instead retaliating against appellant for rejecting his repeated overtures to reconcile with him. Respondent's self-righteous condemnation of appellant's conduct rings especially false in view of his admission that after the divorce he repeatedly asked appellant to live with him without remarrying.

The trial court's finding that custody should be awarded to respondent because appellant's conduct caused the children embarrassment was also drawn from a blank page. Aside from the testimony of appellant's mother, in which she conceded that she asked the children "laden" questions in an attempt to elicit responses that they "resented" appellant's behavior, the only testimony about the children's embarrassment came from appellant. She testified that her older daughter had expressed discomfort with her grandmother's relentless questions about appellant's behavior and did not know how to protect her mother. Aside from this testimony, which suggests that the child was uncomfortable with her grandmother, there was no corroboration for the trial court's conclusion that the children felt uncomfortable about their mother's actions.

Finally, to support its conclusion that appellant's conduct caused serious harm to the children's moral development, the trial court found that appellant had instructed her children to lie about the sleeping arrangements. This finding was based upon the trial court's interview with the children in chambers. Because there is no record of that exchange, there is no adequate basis for reviewing that conclusion. Although appellant offered to take a polygraph test to establish that she had not instructed the children to lie, the trial court summarily denied her that opportunity, thus compounding the difficulty of evaluating the issue. But even if the children did lie to the judge about their mother's conduct, this fact does not indicate that appellant is less capable of caring for the children or that her conduct has had an adverse impact upon them sufficient to meet the requirements of *Becker*. At most, the children's conduct underscores their attempt to protect their mother and themselves from the invasive inquiries of the trial court, prompted by the harassing conduct of their father in instituting the proceeding. Such defensive tactics are an almost inevitable result of the minimal change-of-circumstances requirement the trial court apparently felt free to employ, a standard that encourages litigation over minor details of the custodial parent's living arrangements.

I conclude, then, that the trial court's determination that the children were harmed is based on nothing more than its finding that the mother engaged in extramarital intercourse with her boyfriend, who is now her husband. As a matter of law, this is not enough to justify reopening the custody order or changing custody. In the name of deferring to the trial court's findings, the majority has departed from the teachings of *Stuber*, *Hogge*, and *Becker*.

It is important to point up the potentially wide-ranging effect of this decision and the fundamentally unwise policy choices the Court is making, perhaps unconsciously. If the majority's *de facto* rejection of the rule in *Stuber*—that extramarital sexual intercourse by a custodial parent alone cannot warrant a change of custody—is followed in other cases, it will prompt a flood of attempts to change custody. Discontented or jealous ex-spouses, like respondent, will be encouraged to look for any evidence that their unmarried custodial ex-spouses are not remaining chaste, hoping that evidence of such conduct will persuade some judge that a sufficient change of circumstances has occurred to warrant a change of custody. Whatever one's personal views may be about the morality of such conduct, it is wholly unrealistic to

think that extramarital sex among otherwise caring and fit divorced parents is rare. Yet each such instance could provide the complaining ex-spouse with a pretext for initiating a custody dispute.[2] The psychic damage to children from such struggles provides ample reason for adhering to *Stuber* and rejecting the rule applied by the trial court and tacitly approved by the majority.[3]

The uncritical deference the majority gives to the trial court's finding of a change of circumstances is inconsistent with *Hogge* and *Becker* and constitutes an even poorer policy choice than that represented by its refusal to follow *Stuber*. In general, an appellate court should defer to trial court findings in equitable matters pertaining to divorce and custody. However, deference does not mean that the reviewing court may abandon its obligation to insure that the trial court has correctly applied the law. *See, e.g., Jones v. Jones*, Utah, 700 P.2d 1072, 1074 (1985).

To be more specific, it is appropriate that we defer to a trial court's determination of the parent to be given custody in an initial custody order. The law imposes upon judges in divorce cases the duty of deciding which of two fit parents should have custody of young children. Trial courts do not undertake this responsibility lightly, and for good reason. Determining whether one parent is slightly more fit than another is a very subtle and to some extent predictive judgment; the correctness of such a decision cannot be determined with scientific accuracy. Therefore, the trial court's initial finding as to what placement will serve the best interests of the children should not be second-guessed.

However, when the decision being reviewed reopens the custody question after finding that a change of circumstances has occurred and then shifts custody from one parent to another, we should not defer to the trial court's change-of-circumstances finding because such deference conflicts with the whole thrust of *Hogge* and *Becker*. Those cases deny to trial courts broad latitude to reopen custody orders and were intended to discourage ex-spouses from instituting modification-of-custody battles unless they have very solid grounds. If we are to follow *Hogge* and *Becker*, we must review with heightened scrutiny determinations that a change of circumstances has occurred and affirm them only when they are supported by factual findings which are, in turn, founded on substantial record evidence.

The refusal of *Hogge* and *Becker* to give trial courts the same broad discretion to reopen custody orders that is accorded them when initial custody awards are at issue is rooted in sound policy. Once a child has been placed in the custody of one parent, a factor comes into play that was not present at the time of the initial custody determination—the strong potential for harming a child by destabilizing his or her life. Because of this risk, *Hogge* and *Becker* make stability the primary value in attempts to reopen custody orders. Even in the interest of moving a child to a better parent, custody orders should not be

---

**2.** I do not suggest that a custodial parent's participation in extramarital sex will never provide a basis for changing custody. If such activity adversely affects a child in a particular case, the standard of *Becker* may well be met and further consideration should be given to changing custody. No such facts were apparent here.

**3.** Because the mother behaved in a morally questionable manner, some might argue that a change of custody was proper. However, the whole purpose of custody reconsideration is perverted if it is simply a means of punishing the custodial parent for conduct a court believes is inappropriate. *Stuber* rejected such a rule. Moreover, past conduct is relevant in custody

proceedings only if it is indicative of harm to the children or predictive of future detrimental conduct. *See In re Custody of Saloga*, 96 Ill. App.3d 661, 667, 52 Ill.Dec. 128, 133, 421 N.E.2d 991, 996 (1981). In the present case, appellant married her boyfriend prior to the first appeal. Thus, on remand there was absolutely no basis for the trial court's stated conclusion that appellant's conduct was likely to recur and, absent this evidence, there was no basis for its finding that appellant was any less fit as a custodian than she had been when the divorce decree awarded her custody. *See Krabel v. Krabel*, 102 Ill.App.3d 251, 253–54, 57 Ill.Dec. 831, 832–33, 429 N.E.2d 1105, 1106–07 (1981).

opened absent a strong showing that there has been a change in the circumstances of the custodial parent so substantial as to raise serious questions as to his or her fitness to care for the child.

Other courts have also recognized the value of stability by raising high presumptions against changes in custody. *See Hogge v. Hogge*, 649 P.2d at 54, and cases cited. For example, the Ohio court in *Whaley v. Whaley*, 61 Ohio App.2d 111, 399 N.E.2d 1270, 1272 (1978), stated:

> The principle of finality is particularly necessary in custody cases because of the special needs of a child. A child needs a continuing relationship with the person who cares for him, and any time that continuity is broken the child suffers.

The importance of stability is not just a fancy of the judicial imagination. As Dean Hafen of the J. Reuben Clark School of Law has noted, the primacy of the need for stability has been well-documented:

> Empirical studies establish beyond question "the need of every child for unbroken continuity of affectionate and stimulating relationships with an adult." More broadly, "[c]ontinuity of relationships, surroundings, and environmental influence are essential for a child's normal development." *The child's need for these forms of stability is so great that disruptions of the child-parent relationship by the state, even when there appears to be inadequate parental care, frequently do more harm than good.*

Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests*, 81 Mich.L.Rev. 463, 473–74 (1983) (emphasis added; citations omitted).

Dean Hafen's remarks deserve some attention. He notes that when "the state" disrupts child-parent relationships for the purported good of the child, a net harm often results *"even when there appears to be inadequate parental care."* I would remind the court that "the state" includes well-meaning trial judges, and I suggest that if net harm often results from a change of custody "when there appears to be inadequate parental care," then we can assume that a child is almost certain to be harmed by a change of custody that is ordered for no better purpose than to move the child from a fit parent to what a court perceives as a more fit parent. The urge to improve a child's custodial situation for his or her own good is a strong one, and courts are endowed with extraordinary power to intervene in the relationship between divorced parents and their children. However, courts are not omnipotent. The teaching of *Hogge* and *Becker*, and of the empirical studies cited by Dean Hafen, is that there are limits on a court's ability to enhance a child's life through changes of custody; beyond those limits, courts do positive harm. This is the lesson that the trial court did not learn and that the majority ignores in its solicitude for the trial court's discretion.

I do not impugn the trial judge's motives or question that he thought he acted in the best interests of the children. However, since there was no clear showing that the custodial parent had become substantially impaired in her ability to function as a parent, I conclude that the trial judge's order contravened *Stuber, Hogge,* and *Becker.* It also probably harmed the children. The order should be reversed.

The struggle for custody of these children has taken almost four years and certainly has disrupted their lives. It might be argued that the harm done to them by setting aside the erroneous custody award will outweigh any benefit. Indeed, it appears to me that this concern may have prompted the majority to reach today's result. If I am correct in this supposition, then the result in this case can be regarded as an anomaly—a decision that can be relegated to the legal backwaters and ignored, somthing fervently to be hoped. However, I disagree that the harm incident to a reversal warrants the result reached by the majority. First, we do not do justice to the parties in this case by upholding a plainly improper order and rewarding the ex-husband who instituted this meritless custody

challenge. Second, the damage done by wrongly deciding this case and encouraging more ex-spouses to bring on baseless attempts to change custody far outweighs any harm to the Shioji children that would attend a reversal. We cannot let the fact that these proceedings have dragged on dictate the law we enunciate or the result we reach. Custody of the children should be returned to appellant.

DURHAM, Justice, concurs in the dissenting opinion of Justice ZIMMERMAN.

